UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
LAFAYETTE DIVISION

LARRY MARTIN, JR.                    CIVIL ACTION NO. 6:17-cv-01459

VERSUS                               JUDGE TRIMBLE

U.S. COMMISSIONER,                   MAGISTRATE JUDGE HANNA
SOCIAL SECURITY
ADMINISTRATION

## REPORT AND RECOMMENDATION

Before the Court is an appeal of the Commissioner's finding of non-disability.

Considering the administrative record, the briefs of the parties, and the applicable

law, it is recommended that the Commissioner's decision be affirmed.

### ADMINISTRATIVE PROCEEDINGS

The claimant, Larry Martin, Jr., fully exhausted his administrative remedies

before filing this action in federal court.   He filed an application for disability

insurance benefits ("DIB")[1] and an application for supplemental security income

benefits ("SSI"),[2] alleging disability beginning on October 23, 2014.   Both

applications were denied.[3]   He then requested a hearing, which was held on June 8,

---

[1]      Rec. Doc. 7-1 at 129.

[2]      Rec. Doc. 7-1 at 136.

[3]      Rec. Doc. 7-1 at 70, 77.

2016 before Administrative Law Judge Christine Hilleren.[4]  The ALJ issued a decision on August 24, 2016,[5] concluding that the claimant was not disabled within the meaning of the Social Security Act from October 23, 2014 (the alleged disability onset date) through August 24, 2016 (the date of the decision).  The claimant asked for review of the decision, but the Appeals Council found no basis for review.[6] Therefore, the ALJ's decision became the final decision of the Commissioner for the purpose of the Court's review pursuant to 42 U.S.C. § 405(g).  The claimant then filed this action seeking review of the Commissioner's decision.

## SUMMARY OF PERTINENT FACTS

The claimant was born on July 3, 1968.[7]  At the time of the ALJ's decision, he was forty-eight years old.  He graduated from high school.[8]  He worked for several years as a welder,[9] and was also self-employed cutting grass and washing cars from 2010 to 2011.[10]  He has not worked since October 2014.[11]  He alleged that he has

---

[4]    Rec. Doc. 7-1 at 39-69.

[5]    Rec. Doc. 7-1 at 26-33.

[6]    Rec. Doc. 7-1 at 4.

[7]    Rec. Doc. 7-1 at 45.

[8]    Rec. Doc. 7-1 at 47.

[9]    Rec. Doc. 7-1 at 47-48, 173.

[10]    Rec. Doc. 7-1 at 48.

[11]    Rec. Doc. 7-1 at 47.

been disabled since that time due to high blood pressure, heart palpitations, and a damaged mitral valve in his heart.[12]  Although the information supplied along his applications for benefits indicated that he also had kidney failure,[13] there is no evidence in the record that the claimant was ever treated for a kidney condition, and the claimant did not mention a kidney condition when asked at the hearing to explain the bases for his disability.

On February 21, 2014,[14] the claimant was seen in the emergency room at Dauterive Hospital in New Iberia, Louisiana, complaining of chest pain.  Two chest x-rays were normal and showed no evidence of acute cardiopulmonary process; however, an electrocardiogram ("EKG") was abnormal.  The claimant was released with a prescription for Norvasc 10 mg.

The claimant returned to the emergency room at Dauterive Hospital on July 20, 2014.[15]  He complained of dizziness and earache, and he gave a history of hypertension.  He was released with a prescription for Meclizine 25 mg to treat the dizziness, as well as another illegible prescription.  He was advised to follow up with an ear, nose, and throat specialist.

---

[12]     Rec. Doc. 7-1 at 49-50.

[13]     Rec. Doc. 7-1 at 71, 78, 165.

[14]     Rec. Doc. 7-1 at 392-400.

[15]     Rec. Doc. 7-1 at 390-391.

On the morning of October 24, 2014, the claimant was seen in the emergency room at Iberia Medical Center in New Iberia, Louisiana.[16] He complained of chest pain that had started about a week earlier, sweating, nausea, and shortness of breath. He indicated that nothing worsened or relieved the pain. He reported that the pain started during rest, was moderate upon onset, and was mild when he was seen in the emergency room. He gave a history of hypertension and gastroesophageal reflux disease. He also reported that he had undergone a stress test in 2006. His blood pressure was 168/83, and his heart rate was 102. Blood work was done, two chest x-rays were normal, and an EKG was abnormal, showing sinus tachycardia, probable left atrial enlargement, and left ventricular hypertrophy with secondary repolarization abnormality. He was discharged before noon with diagnoses of acute chest pain and gastroesophageal reflux.

Later that same day, he was seen in the emergency room at University Hospital & Clinics in Lafayette, Louisiana. He was in mild distress, and he complained of chest pain that had started two days earlier and worsened the night before with sweating and nausea. He described the pain as tightness and pressure located below his sternum and radiating into his left arm and shoulder. He reported that the pain was moderately severe at onset and moderate at its maximum, relieved

---

[16]      Rec. Doc. 7-1 at 274-324, 342-349.

by nothing, and worsened by nothing.  He also complained of a headache.  Blood work was done.  Two x-rays of his chest showed no acute cardiopulmonary process. An EKG was abnormal.  He was prescribed Norvasc 10 mg, Hydrochlorothiazide 12.5 mg, Pantopraxole 40 mg, and Ultram 50 mg.  He was released with instructions to follow up with his primary care physician.  The diagnoses were chest wall pain, esophageal reflux, and hypertension.

Just three days later, on October 27, 2014, the claimant was seen in the emergency room at Franklin Foundation Hospital in Franklin, Louisiana.[17]  He complained of chest pain, heart palpitations, and sinus congestion.  An EKG was normal, and chest x-rays were unremarkable.  The diagnoses were sinusitis, palpitations, chest pain, and dehydration.  He was advised to increase his fluid intake, rest, and follow up with his family doctor.  He was given a Z-pack for the sinusitis. He was released from the hospital after about two hours.

Two days later, on October 29, 2014,[18] the claimant was scheduled to have a cardiac stress test in the cardiology department at University Hospital & Clinics, but he was transferred to the emergency department before the test was performed due to complaints of sharp left-sided chest pain.  The claimant reported having had two weeks of intermittent chest tightness with palpitations.  He reported that he had no

---

[17]    Rec. Doc. 7-1 at 354-361.

[18]    Rec. Doc. 7-1 at 216-270, 325-328.

history of diagnosed heart disease or heart attacks, but a history of resistant hypertension, for which he was prescribed three medications. His blood pressure was 155/92. An EKG showed changes from the week before. Cardiac enzyme testing was negative. Chest x-rays showed no change and no active chest disease. The claimant was diagnosed with chest pain and advised to follow up in the cardiology clinic to reschedule the stress test he had missed.

On November 3, 2014, the claimant was seen in the internal medicine clinic at University Hospital & Clinics.[19] He gave a history of chest pain with nausea, sweating, and lightheadedness that started about three weeks earlier. He rated the pain as 7/10, denied radiation of the pain, and stated that the pain usually occurred at rest and never occurred on exertion. He stated that the last episode had been on October 29. His problem list included back pain, chest pain, shortness of breath, hypertension, and obesity. His blood pressure was 163/106. Upon examination, it was determined that he had a normal heart rate, a regular heart rhythm, no murmur, good pulses equal in all extremities, and no edema. An EKG and chemical blood analysis were both negative for acute ischemia on October 29. His medications were adjusted, and a stress test was ordered.

---

[19]    Rec. Doc. 7-1 at 329-335.

On November 11, 2014, the claimant had an exercise stress test at University Hospital & Clinics.[20]   The test was negative, and the physician noted that the claimant had "good physical fitness."

On June 23, 2015, the claimant was seen in the emergency room at Franklin Foundation Hospital complaining of heart palpitations.[21]   An EKG showed borderline abnormalities and a chest x-ray was normal.  He was given an excuse from work for June 23 through June 25 but released to return to work on June 26, 2015.  The discharge diagnosis was palpitations.  The claimant was advised to rest for two to three days, follow a low sodium diet, drink plenty of fluids, follow up with his primary care doctor, and follow up at the cardiology clinic at University Hospitals & Clinic.  He was also prescribed a Z-pack and advised to take all of it.

The claimant was seen in the emergency room at Dauterive Hospital on April 8, 2015 for complaints of chest pain.[22]  A chest x-ray was normal.

The claimant was seen in the emergency room at Franklin Foundation Hospital on January 4, 2016.[23]   He was diagnosed with bronchitis and chest discomfort.  He was discharged with instructions to take his medications, stay

---

[20]      Rec. Doc. 7-1 at 273.

[21]      Rec. Doc. 7-1 at 362-376.

[22]      Rec. Doc. 7-1 at 385-389.

[23]      Rec. Doc. 7-1 at 446-464.

hydrated, and follow up with a cardiologist.  The emergency room doctor requested that the claimant be excused from work from January 4 through January 6, 2016 and advised the claimant to follow up with his primary care physician with regard to any additional days off.

On January 22, 2016, the claimant was seen in the cardiology clinic at University Hospital & Clinics.[24]  Thyroid testing was performed.  His history included hypertension and hyperlipidemia.  He denied chest pain, shortness of breath, or labored breathing upon exertion.  He reported that the palpitations occurred about every other week or every two weeks, and lasted for several minutes.  The doctor noted that the lab work done in the emergency department was normal and a stress echocardiogram in 2014 was negative for ischemia.  Examination revealed a normal heart rate with a regular rhythm, no murmur, no gallop, good pulses equal in all extremities, and no edema.  His blood pressure was 150/83.  The following medications were prescribed:  Norvasc 10 mg, Hydrochlorothiazide-Lisinopril 12.5 mg, and Metoprolol Tartrate 50 mg.  The claimant was to follow up in three months.

A transthoracic echocardiogram was performed at University Hospital & Clinics on February 10, 2016.[25]  The test revealed mild mitral valve regurgitation,

---

[24]    Rec. Doc. 7-1 at 435-437.

[25]    Rec. Doc. 7-1 at 421-426.

mild aortic valve regurgitation, and mild tricuspid valve regurgitation consistent with mild pulmonary hypertension. On the same day, the claimant had an exercise stress test that was negative and showed good physical fitness.[26]

On April 1, 2016, the claimant was again seen in the cardiology clinic at University Hospitals & Clinics.[27] His chief complaint was that he was tired all the time. He gave a history of hypertension, hyperlipidemia, palpitations, and Bradycardia (abnormally slow heart action). It was noted that his prior cardiac work up was negative in that his Troponin level and EKG were normal when he was seen in the emergency room. He denied chest pain, shortness of breath, or labored breathing on exertion. His blood pressure was 148/90 and his pulse rate was 58. The treatment note indicated that the claimant's hypertension was not at goal but the claimant reported that his blood pressure was at goal when he measured it at home. The doctor attributed the high reading to the stress of the medical appointment. The claimant was advised to lose weight. It was noted that the claimant's palpitations were "much improved" since he had stopped ingesting caffeine and started taking Metoprolol tartrate 25 mg. The doctor ordered a 30-day monitoring of the claimant's cardiac condition and a follow up visit in four months.

---

[26]    Rec. Doc. 7-1 at 425.

[27]    Rec. Doc. 7-1 at 431-433.

On June 8, 2016, the claimant testified at a hearing regarding his symptoms, his functional impairments, and his medical treatment.[28] He stated that he was 5'6" tall, weighed 220 pounds, and was right-handed. He said that he was divorced, had two grown children, and lived with one of his children, a step-daughter, and the step-daughter's mother. He said that he had no source of income, received no government benefits, and had no health insurance. He testified that he had never had a driver's license because he never took the driving test, and used a bicycle for transportation.

The claimant testified that he graduated from high school and worked as a welder from 1991 to 2014 for various employers including Bollinger Shipyards and Coral Marine Services. In 2010 and 2011, he was self-employed cutting grass and washing cars. He stopped working in October 2014.

The claimant stated that his high blood pressure prevented him from performing his job duties, but a change in medication had improved his hypertension. He stated that it typically ran about 160/85. He stated that his hypertension makes him feel tired and causes dizziness approximately three to four times per week, for about three to four minutes at a time. He also claimed that it caused his heart to beat a little faster.

---

[28]    Rec. Doc. 7-1 at 39-69.

The claimant also complained about heart palpitations. He described the palpitations as intermittent and said that they made him feel so bad that he needed to lie down for three to four hours per day. He stated that the palpitations frightened him and caused weakness, fatigue, chest tightness, and shortness of breath. The palpitations also prevented him from going to sleep. He stated that there is no cure for the palpitations but he reported taking Metoprolol for that condition. The palpitations sometimes started when he was resting; therefore, they are not correlated to increased physical activity. However, he stated that he decreased his activity level on advice from his physician.

The claimant explained that an echocardiogram revealed that he had a leaking mitral valve in his heart. At the time of the hearing, he was waiting for a Holter monitor so that the frequency of the palpitations could be evaluation. He stated that his doctor did not want to do surgery at that time.

The claimant estimated that he could walk about ten minutes, stand for about five minutes, and sit for about ten minutes at a time. He estimated that he could lift a gallon of milk with each hand.

He testified that he spent most of his time watching TV. Someone else prepared his meals, but he could do it for himself if he had to. He stated that he did not need assistance with personal hygiene. He went to church with his daughters and sometimes went to the store with them. He had no hobbies.

11

The claimant now seeks reversal of the Commissioner's adverse ruling.

## ANALYSIS

### A.  STANDARD OF REVIEW

Judicial review of the Commissioner's denial of disability benefits is limited to determining whether substantial evidence supports the decision and whether the proper legal standards were used in evaluating the evidence.[29] "Substantial evidence is more than a scintilla, less than a preponderance, and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."[30] Substantial evidence "must do more than create a suspicion of the existence of the fact to be established, but 'no substantial evidence' will only be found when there is a 'conspicuous absence of credible choices' or 'no contrary medical evidence.'"[31]

If the Commissioner's findings are supported by substantial evidence, they are conclusive and must be affirmed.[32]  In reviewing the Commissioner's findings, a court must carefully examine the entire record, but refrain from re-weighing the evidence or substituting its judgment for that of the Commissioner.[33]  Conflicts in

---

[29]     *Villa v. Sullivan*, 895 F.2d 1019, 1021 (5th Cir. 1990); *Martinez v. Chater*, 64 F.3d 172, 173 (5th Cir. 1995).

[30]     *Hames v. Heckler*, 707 F.2d 162, 164 (5th Cir. 1983).

[31]     *Hames v. Heckler*, 707 F.2d at 164 (citations omitted).

[32]     42 U.S.C. § 405(g); *Martinez v. Chater*, 64 F.3d at 173.

[33]     *Hollis v. Bowen*, 837 F.2d 1378, 1383 (5th Cir. 1988); *Villa v. Sullivan*, 895 F.2d at 1022.

the evidence[34] and credibility assessments[35] are for the Commissioner to resolve, not the courts.  Four elements of proof are weighed by the courts in determining if substantial evidence supports the Commissioner's determination:  (1) objective medical facts, (2) diagnoses and opinions of treating and examining physicians, (3) the claimant's subjective evidence of pain and disability, and (4) the claimant's age, education, and work experience.[36]

## B.    ENTITLEMENT TO BENEFITS

The Disability Insurance Benefit ("DIB") program provides income to individuals who are forced into involuntary, premature retirement, provided they are both insured and disabled, regardless of indigence.[37]  Every individual who meets certain income and resource requirements, has filed an application for benefits, and is determined to be disabled is eligible to receive Supplemental Security Income ("SSI") benefits.[38]

A person is disabled "if he is unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment

---

[34]    *Scott v. Heckler*, 770 F.2d 482, 485 (5th Cir. 1985).

[35]    *Wren v. Sullivan*, 925 F.2d 123, 126 (5th Cir. 1991).

[36]    *Wren v. Sullivan*, 925 F.2d at 126.

[37]    See 42 U.S.C. § 423(a).

[38]    42 U.S.C. § 1382(a)(1) & (2).

which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months."[39]  A claimant is disabled only if his physical or mental impairment or impairments are so severe that he is unable to not only do his previous work, but cannot, considering his age, education, and work experience, participate in any other kind of substantial gainful work which exists in significant numbers in the national economy, regardless of whether such work exists in the area in which the claimant lives, whether a specific job vacancy exists, or whether the claimant would be hired if he applied for work.[40]

## C.    EVALUATION PROCESS AND BURDEN OF PROOF

The Commissioner uses a sequential five-step inquiry to determine whether a claimant is disabled.  This process requires the ALJ to determine whether the claimant (1) is currently working; (2) has a severe impairment; (3) has an impairment listed in or medically equivalent to those in 20 C.F.R. Part 404, Subpart P, Appendix 1; (4) is able to do the work he did in the past; and (5) can perform any other work.[41]

Before going from step three to step four, the Commissioner assesses the claimant's residual functional capacity[42] by determining the most the claimant can

---

[39]    42 U.S.C. § 1382c(a)(3)(A).

[40]    42 U.S.C. § 1382c(a)(3)(B).

[41]    20 C.F.R. § 404.1520.

[42]    20 C.F.R. § 404.1520(a)(4).

still do despite his physical and mental limitations based on all relevant evidence in the record.[43]  The claimant's residual functional capacity is used at the fourth step to determine if he can still do his past relevant work and at the fifth step to determine whether he can adjust to any other type of work.[44]

The claimant bears the burden of proof on the first four steps; at the fifth step, however, the Commissioner bears the burden of showing that the claimant can perform other substantial work in the national economy.[45]  This burden may be satisfied by reference to the Medical-Vocational Guidelines of the regulations, by expert vocational testimony, or by other similar evidence.[46]  If the Commissioner makes the necessary showing at step five, the burden shifts back to the claimant to rebut this finding.[47]  A finding that a claimant is disabled or is not disabled at any point in the five-step review is conclusive and terminates the analysis."[48]

---

[43]     20 C.F.R. § 404.1545(a)(1).

[44]     20 C.F.R. § 404.1520(e).

[45]     *Graves v. Colvin*, 837 F.3d 589, 592 (5th Cir. 2016); *Bowling v. Shalala*, 36 F.3d 431, 435 (5th Cir. 1994).

[46]     *Fraga v. Bowen*, 810 F.2d 1296, 1304 (5th Cir. 1987).

[47]     *Perez v. Barnhart*, 415 F.3d 457, 461 (5th Cir. 2005); *Fraga v. Bowen*, 810 F.2d at 1302.

[48]     *Greenspan v. Shalala*, 38 F.3d 232, 236 (5th Cir. 1994), cert. den. 914 U.S. 1120 (1995) (quoting *Lovelace v. Bowen*, 813 F.2d 55, 58 (5th Cir. 1987)).

**D.**    **THE ALJ'S FINDINGS AND CONCLUSIONS**

In this case, the ALJ determined, at step one, that the claimant has not engaged in substantial gainful activity since October 23, 2014.[49]  This finding is supported by substantial evidence in the record.

At step two, the ALJ found that the claimant has the following severe impairments:  obesity, essential hypertension, and cardiac regurgitation.[50]  This finding is supported by substantial evidence in the record.

At step three, the ALJ found that the claimant has no impairment or combination of impairments that meets or medically equals the severity of a listed impairment.[51]  The claimant did not challenge this finding.

The ALJ found that the claimant has the residual functional capacity to perform light work but explained that he could lift and/or carry (including pushing or pulling) twenty pounds occasionally and ten pounds frequently, stand and/or walk for two hours per eight-hour work day, and sit for six hours per eight-hour work day. The ALJ also found that the claimant would need to avoid unprotected heights,

---

[49]    Rec. Doc. 7-1 at 28.

[50]    Rec. Doc. 7-1 at 28.

[51]    Rec. Doc. 7-1 at 29.

fumes, odors, dust, gases, and poor ventilation, and could only occasionally climb ladders, ropes, and scaffolds.[52]  The claimant challenged this finding.

At step four, the ALJ found that the claimant is not capable of performing any past relevant work.[53]  The claimant did not challenge this finding.

At step five, the ALJ found that the claimant was not disabled based on the Medical-Vocational Rules and also because there are jobs in the national economy that he can perform.[54]  The claimant challenged this finding.

### E.  THE ALLEGATIONS OF ERROR

The claimant contends that the ALJ erred (1) by finding the claimant capable of performing light work; (2) by finding that the vocational expert's testimony was not consistent with the DOT; (3) by relying upon defective vocational expert testimony; and (4) by failing to satisfy the duties owed to an unrepresented claimant.

### F.  DID THE ALJ ERR IN EVALUATING THE CLAIMANT'S RESIDUAL FUNCTIONAL CAPACITY?

The claimant objected to the ALJ's evaluation of his residual functional capacity.  Although light work generally entails the ability to stand or walk, off and

---

[52]     Rec. Doc. 7-1 at 29.

[53]     Rec. Doc. 7-1 at 31.

[54]     Rec. Doc. 7-1 at 32.

on, for six hours out of an eight-hour work day,[55] the ALJ found that the claimant retained the ability to perform only a modified range of light work, and was limited to standing and walking for two hours out of an eight-hour work day.  Since sedentary work requires the ability to stand or walk for no more than about two hours out of an eight-hour work day,[56] the claimant argued that the ALJ actually found him only capable of performing sedentary work.

The record contains no treatment notes or other medical evidence placing any functional restrictions on the claimant's activities.  Further, the claimant did not submit a functional analysis from any treating or consulting physician opining that the claimant was unable to perform light or sedentary work.  The only evidence in the record from medical professionals concerning his ability to work were notes from emergency room doctors who advised the claimant's employer that he was able to return to work as a welder, which the vocational expert defined as skilled medium level work,[57] after a few days of rest in June 2015 and again in January 2016.  The claimant testified, however, that he is only able to sit, walk, and stand for limited amounts of time and further testified that he rests if he becomes short of breath or begins to experience chest pain or heart palpitations.  However, he also told his

---

[55]      SSR 83-10.

[56]      SSR 83-10.

[57]      Rec. Doc. 7-1 at 64.

doctors that his symptoms are not brought on by exertion.  He rides a bicycle for transportation; if he becomes dizzy or experiences palpitations while riding his bike, he stops and rests for a while.  He does not require assistance with showering, can prepare his own meals if necessary, attends church, and sometimes accompanies his daughters on shopping trips.  While the claimant testified that he must lie down for three to four hours per day, the ALJ apparently discounted this testimony as not entirely consistent with the medical evidence in the record.  Despite the claimant's contention that his cardiac problems severely limit his functionality, there are significant gaps in treatment reflected in the record and no opinions from any treating physician regarding his functional capabilities.

In his briefing, the claimant pointed to nothing specific that would support a conclusion that he is incapable of performing light or sedentary work, relying solely on the ALJ's limitation of walking and standing to two hours per day as the basis for his criticism of the residual functional capacity assigned by the ALJ.  Accordingly, this Court finds that the ALJ's residual functional capacity evaluation was reached by applying the proper legal standard and was based on substantial evidence in the record.

Perhaps the ALJ should more properly have found that the claimant was capable of performing only sedentary work rather than light work with the stated

modifications.  If so, however, that error was harmless, as will be discussed in more detail, below.

## G.  DID THE ALJ ERR IN FINDING THAT THE VOCATIONAL EXPERT'S TESTIMONY WAS CONSISTENT WITH THE DOT?

At the hearing, the ALJ asked the vocational expert if there were light jobs in the national economy that a hypothetical claimant was capable of performing, whether the number of available jobs identified by the expert would be reduced if the hypothetical claimant could only stand or walk for two hours out of an eight-hour day, and whether the jobs identified by the expert were consistent with the information contained in the Dictionary of Occupational Titles ("DOT").  The expert testified that there were such jobs – ticket seller, booth cashier, toll collector, and information clerk, that the number of information clerk jobs would be reduced by 5% with the limitation on standing and walking, and that the information provided was consistent with the DOT.  The claimant argued that the vocational expert's testimony concerning consistency with the DOT was incorrect.  But the claimant offered only his own analysis of those jobs in support of his argument, without any evidence of vocational expertise, and without any statutory or jurisprudential authority for his position.  Thus, the claimant did not establish that there was any actual flaw in the expert's testimony or, consequently, any reason why the ALJ should not have relied on the expert's testimony.

20

Accordingly, this Court finds that the claimant failed to establish an error on the part of the ALJ with regard to the vocational expert's testimony that the information provided in his testimony was consistent with the DOT.

### H.    DID THE ALJ ERR IN RELYING UPON DEFECTIVE VOCATIONAL EXPERT TESTIMONY?

The claimant argued that the ALJ erred in relying upon the vocational expert's testimony at step five of the sequential analysis because there was a conflict between the expert's testimony and the DOT.  As noted above, however, the claimant argued that there was a conflict between the ALJ's testimony and the DOT but failed to prove that such a conflict actually existed.  The expert testified that jobs such as ticket seller, booth cashier, toll collector, and information clerk were all light, unskilled jobs available in significant numbers in the national economy.  The expert further testified that the number of available toll collector and booth cashier jobs would not be eroded if the worker was able to stand or walk only two hours per work day.  With regard to the information clerk jobs, the expert testified that number of available jobs would be reduced by approximately 5% if the worker was able to stand or walk only two hours per day.  The vocational expert testified that her testimony was based on her experience in surveying the labor market, speaking with employers, observing how the work is performed, and speaking with employees performing such job duties.  She also expressly confirmed that her testimony was consistent with the DOT.

Even if there was an inconsistency, however, the claimant failed to prove that he is incapable of performing the jobs identified by the vocational expert. While the Commissioner bears the burden of proof at step five, the burden then shifts back to the claimant to rebut the finding. While the claimant argued that the vocational expert "clothed 'light' jobs in Sedentary clothing," he offered no evidence refuting the vocational expert's testimony. Therefore, the claimant did not establish that the ALJ erred in relying upon the vocational expert's testimony.

## I.    DID THE ALJ ERR BY FAILING TO SATISFY THE DUTIES OWED TO AN UNREPRESENTED CLAIMANT?

An ALJ owes a duty to a claimant "to develop the record fully and fairly to ensure that his decision is an informed decision based on sufficient facts."[58] When a claimant is proceeding without legal representation, as in this case, the ALJ owes a heightened duty to "scrupulously and conscientiously probe into, inquire of, and explore for all relevant facts."[59] The court must reverse an ALJ's decision as not supported by substantial evidence if the claimant shows (1) that the ALJ failed to fulfill his duty to adequately develop the record, and (2) that the claimant was

---

[58]    *Brock v. Chater*, 84 F.3d 726, 728 (5th Cir.1986) (citing *Kane v. Heckler*, 731 F.2d 1216, 1219 (5th Cir.1984)).

[59]    *Kane v. Heckler*, 731 F.2d at 1219–20 (citations and internal quotation marks omitted).

prejudiced thereby.[60]  In order to show prejudice, the claimant must show that he "could and would have adduced evidence that might have altered the result."[61]

A claimant has a statutory right to counsel at a Social Security hearing,[62] and the Commissioner has a duty to notify the claimant of that right.[63]  In this case, the ALJ engaged in a colloquy with the claimant at the hearing to assure that the claimant understood that the hearing would be postponed if he wished to obtain representation.  It is apparent from the transcript of the hearing, and based on the claimant's having a high school education and command of the English language exhibited in the hearing transcript, that he understood the ALJ's explanation and knowingly waived his right to representation.

Additionally, the ALJ made an effort to develop the record by holding the matter open so that additional medical records could be obtained from the claimant's health care providers after the hearing.  Records from all of the providers identified by the claimant at the hearing are now in the record and were relied upon by the ALJ in making her decision.

---

[60]    *Kane v. Heckler*, 731 F.2d at 1220.

[61]    *Brock v. Chater*, 84 F.3d at 728–729 (citing *Kane v. Heckler*, 731 F.2d at 1220).

[62]    *Clark v. Schweiker*, 652 F.2d 399, 403 (5th Cir. 1981) (citing 42 U.S.C. § 406).

[63]    *Clark v. Schweiker*, 652 F.2d at 403.

But the claimant did not argue that the colloquy regarding representation or the obtaining of additional medical records failed to satisfy the ALJ's obligations to unrepresented claimants. Instead, the claimant argued that the ALJ should have inquired into what characteristics of the jobs identified by the vocational expert at the hearing as being within the functional capabilities of the claimant "made them 'light' if the standing and walking was at a sedentary level, and if lifting and carrying of 10 to 20 pounds of weight was not part of the defined job duties."[64] While the claimant's argument is not clearly articulated, this Court interprets the argument to be (a) that the ALJ found the claimant capable of performing light work, while the jobs found by the vocational expert to be available in the national economy actually fell in the sedentary category, and (b) that the ALJ erred in failing to question the vocational expert about this discrepancy.

In order to be disabled, a claimant must be incapable of performing any work at all. Therefore, if a claimant can perform sedentary work, he is not disabled. Alternatively, if the Medical-Vocational Guidelines ("the Grids") are applied and the claimant's age falls within a certain range and he has only the capacity to perform sedentary work, he will be deemed to be disabled. In this case, the claimant did not make an effort in his briefing to establish that he is not capable of performing

---

[64]    Rec. Doc. 8 at 9.

sedentary work.  Instead, he argued that a discrepancy in the vocational expert's testimony regarding the difference between available work in the light category and available work in the sedentary category requires remand of this matter for further administrative review.  Perhaps, without directly saying so, he was suggesting that if he is able to perform only sedentary then he should be deemed to be disabled under the Grids.  That argument lacks merit.  The claimant was 48 years old at the time of the ALJ's decision, he was a high school graduate, he had previously performed skilled work, and his skills were not transferable.  Therefore, under the Grids, he would be deemed ***not*** disabled if he were found capable of performing only sedentary work.[65]

The other significant flaw in the claimant's argument is that even if the ALJ had done what the claimant suggests and questioned the vocational expert's opinion regarding available jobs and even if that questioning had resulted in a finding that the claimant was capable of performing sedentary work rather than light work, the ALJ would still have concluded that the claimant was not disabled, and that conclusion would be based on substantial evidence in the record.  Therefore, any error by the ALJ in that regard did not prejudice the claimant.  The claimant did not establish that he could and would have adduced evidence that might have altered the

---

[65]    20 C.F.R. Pt. 404, Subpt. P, App. 2, § 201.17.

result but for the allegedly deficient questioning by the ALJ.  Therefore, the claimant was not prejudiced by any failure of the ALJ to engage in further questioning of the vocational expert regarding the jobs that the expert found to be relevant.  The Fifth Circuit has explained that "[p]rocedural perfection in administrative proceedings is not required" and that judgments will not be vacated unless the substantial rights of a party have been affected.[66]  Without establishing prejudice, the procedural imperfection identified by the claimant does not warrant reversal or remand of the ALJ's decision.

Furthermore, while the ALJ has an enhanced duty to fully develop the record when the claimant is not represented, the ALJ does not have a duty to advocate on the part of an unrepresented claimant.[67]  Therefore, the ALJ was not required to question the vocational expert as though she were representing the claimant at the hearing.

Accordingly, this Court finds that the ALJ's questioning of the vocational expert at the hearing did not constitute reversible error.

---

[66]      *Mays v. Bowen*, 837 F.2d 1362, 1364 (5th Cir. 1988)

[67]      *McKinney v. Astrue*, No. H-08-1009, 2009 WL 1940085, at *10 (S.D. Tex. July 2, 2009). See, also, *Glass v. Shalala*, 43 F.3d 1392, 1396(10th Cir.1993) (citing *Henrie v. U.S. Dept. of Health & Human Services*, 13 F.3d 359, 361 (10th Cir. 1993)).

## CONCLUSION AND RECOMMENDATION

IT IS THE RECOMMENDATION of this Court that the decision of the Commissioner be AFFIRMED and this matter be dismissed with prejudice.

Under the provisions of 28 U.S.C. § 636(b)(1)(C) and Rule Fed. R. Civ. P. 72(b), parties aggrieved by this recommendation have fourteen days from receipt of this report and recommendation to file specific, written objections with the Clerk of Court. A party may respond to another party's objections within fourteen days after receipt of a copy of any objections or responses to the district judge at the time of filing.

Failure to file written objections to the proposed factual findings and/or the proposed legal conclusions reflected in the report and recommendation within fourteen days following the date of receipt, or within the time frame authorized by Fed. R. Civ. P. 6(b) shall bar an aggrieved party from attacking either the factual findings or the legal conclusions accepted by the district court, except upon grounds of plain error.[68]

Signed in Lafayette, Louisiana, this 11th day of July 2018.

_____
PATRICK J. HANNA
UNITED STATES MAGISTRATE JUDGE

---

[68]    See *Douglass v. United Services Automobile Association*, 79 F.3d 1415 (5th Cir. 1996).